## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTOPHER C. TAYLOR,<br>**Plaintiff** | : | No. 4:22cv474 |
| | : | |
| | : | (Judge Munley) |
| **v.** | : | |
| | : | |
| K N B's INFLATABLES PLEASE, LLC, | : | |
| d/b/a KNB INFLATABLES PLEASE, | : | |
| and BOROUGH OF STATE COLLEGE, | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff Christopher C. Taylor contends that Defendant Borough of State College ("State College") violated Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12134 ("ADA"), and the Pennsylvania Human Relations Act, 43 PA. STAT. §§ 952–963 ("PHRA"), after an indoor playground business denied the plaintiff entry due to his service dog. Before the court is a motion for summary judgment filed by Defendant State College. Having been fully briefed, this motion is ripe for disposition.

## Background

Taylor is a combat veteran of the Vietnam War. (Doc. 44-1, Pl. Ex. 1, Pl. Dep., 18:2-9). He sustained serious service-connected injuries and suffers from post-traumatic stress disorder ("PTSD") along with several physical ailments. (Id., 16:5–17:3, 18:2-9, 49:4-20). Taylor relies on a service animal, a yellow Labrador

Retriever named Zeke, to aid with his PTSD and his physical conditions, including those related to his mobility. (Id. 48:25-49:3). Per Taylor, Zeke is "there with [him] every step of the way." (Id. 49:4-50:1).

Taylor also has a grandson who calls the plaintiff, "Pappy Chief." (Id. 19:12-7). Per Taylor, his grandson grabbed his hand one day and said, "Pappy Chief, bounce house." (See id.) Prompted by that request, Taylor traveled to the Nittany Mall in College Township, Centre County, Pennsylvania with his family that day, February 13, 2022. (Id.; see also Doc. 42, SOF ¶¶ 3-4; Doc. 44-3, Pl. Ex. 3, M. Wilson Dep. 15:20-23).

Defendant K N B's Inflatables Please, LLC ("KNB") operated a kids playground business at the mall, which included several bounce house inflatable structures. (Doc. 42, SOF ¶ 3). Taylor intended to watch his grandson play in KNB's bounce houses. (Doc. 44-1, Pl. Ex. 1, Pl. Dep. 19:12-20). Taylor's wife, daughter, and son-in-law were also present, traveling with Taylor's grandson in a separate vehicle. (Id.). Taylor's family entered KNB's business first. (Id. 22:22-24:3).

Arriving to the mall a few minutes later, Taylor then attempted to enter KNB's business with Zeke. (Id.) An owner of KNB told Taylor to leave. (Doc. 42, SOF ¶ 4). That individual advised Taylor that no dogs were allowed in the business at the direction of KNB's insurer. (Id. ¶¶ 4-5). That individual also told

2

Taylor that, if he did not leave, the business would have him arrested. (Id. ¶ 6). An owner of KNB may have also called the police. (Doc. 46, Pl. Ex. 4, A. Estep Bodycam Video 19:50-20:00).

Taylor then stepped outside KNB's business into a common area of the mall. (Doc. 42, SOF ¶ 7; see also Doc. 46, Pl. Ex. 4, A. Estep Bodycam Video). The plaintiff spoke with a mall security employee. (Doc. 42, SOF ¶ 7). Mall security told Taylor that KNB was wrong, but advised the plaintiff that the mall could not address the issue. (Id.) Thereafter, Taylor called 911. (Doc. 44-1, Pl. Ex. 1, Pl. Dep. 35:15-23).

A patrol officer for the State College Police Department, Amanda Estep, responded to the mall. (Doc. 42, SOF ¶ 8). Estep's body-worn camera recorded her interaction with Taylor. (Doc. 46, Pl. Ex. 4). Estep encountered Taylor and Zeke outside KNB's business. (Id. at 1:30). Taylor advised Estep that: 1) he is a disabled veteran; 2) Zeke worked as his service dog; and 3) KNB denied him entry into their indoor playground because of his service dog. (Doc. 44, CSOF ¶ 29). Taylor stated, firmly, "I want access to that store." (Doc. 46, Pl. Ex. 4, at 2:18-2:20). Estep responded, just as firmly, "I cannot force them to allow you in." (Id. at 2:20-2:22).

From there, over the next fourteen (14) minutes, Taylor and Estep engaged in vigorous discussion over the issue, which ultimately ended respectfully and

3

cordially. Early in the conversation, Estep stated: "They are allowed to ask people to leave their business. If the person doesn't leave their business, it's considered trespass. However, that being said, you have every right to file a complaint against them with...the ADA, the Better Business Bureau, whoever is applicable." (Id. at 2:55- 3:14).

At one point during the discussion, Estep also told the plaintiff: "You show me in the Crimes Code where it's a criminal matter at my level, I would definitely enforce it. But it is not." (Id. at 7:27-7:35). As discussed further below, the Pennsylvania Crimes Code makes it a summary offense to deny people access to certain businesses when they are using service dogs to assist with a disability. See 18 PA. CONS. STAT. § 7325(a).

Estep advised Taylor that she would prepare a police report and that he could subpoena that report as part of a civil proceeding. (Doc. 46, Pl. Ex. 4 at 10:28-10:43). The officer then entered KNB's business and spoke with the owners, Keith Schulman and Rebecca Bolling.[1] (Id. at 16:18-16:40). Schulman told the officer that he had no problem with service animals, but his insurance company would not allow them in the business. (Id. at 16:40-16:47). Both Schulman and Bolling also relayed their side of the events and advised Estep

---

[1] Schulman is identified through his previous attempts to represent Defendant KNB *pro se* in this matter. (See Doc. 24, 04/19/2023 Order)(Mariani, J.).

4

that Taylor was agitated and made a threatening statement in response to being denied entry. (Id. at 16:47-18:16, 18:52-19:24).  After advising Schulman and Bolling that she would document everything, Estep exited KNB's indoor playground and closed her response to the incident. (Id. at 21:51-23:51).

It is undisputed that Estep did not advise KNB's representatives that they were committing a summary offense by excluding Taylor from the premises because of his service dog. (See Doc. 44, CSOF ¶ 30).  Estep also did not detain, arrest, or charge Taylor with any crimes. (Doc. 42, SOF ¶ 8; Doc. 42-3, Def. Ex. B, Police Report).

About forty-five (45) days after the incident, Taylor initiated this action against both KNB and State College.  As for KNB, Taylor's amended complaint asserts that the business violated Title III of the ADA related to discrimination in the activities of places of public accommodation.  Taylor's amended complaint also contends that State College violated Title II of the ADA regarding discrimination in public services, programs, and activities.  Additionally, Taylor maintains that both KNB and State College violated the PHRA. Taylor's PHRA claim against State College includes an aiding and abetting discrimination claim pursuant to that state statute.  Taylor did not assert his PHRA aiding and abetting claim against Estep, only State College.

5

The Clerk of Court entered default against KNB on June 21, 2023. (Doc. 33).  Subsequently, Taylor filed a motion for default judgment against KNB. Upon reassignment of this matter, the undersigned entered a case management order and Taylor and State College then proceeded with discovery. At the close of discovery, State College filed the instant motion for summary judgment.  On September 17, 2024, Taylor's motion for default judgment against KNB was denied without prejudice pending a ruling on State College's motion for summary judgment. (Doc. 49).  Having been fully briefed, State College's motion is now ripe for disposition.

**Jurisdiction**

Because this case is brought pursuant to the ADA, the court has jurisdiction under 28 U.S.C. § 1331. ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). The court has supplemental jurisdiction over plaintiff's PHRA claims pursuant to 28 U.S.C. § 1367(a). ("In any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.").

**Standard of Review**

Defendant State College has filed a motion for summary judgment seeking its dismissal from this action with prejudice.  Granting summary judgment is proper " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " See Knabe v. Boury Corp., 114 F.3d 407, 410 n. 4 (3d Cir.1997) (quoting FED. R. CIV. P. 56(c)).  "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir.1990).  The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. Anderson, 477 U.S. at 248.  A fact is material when it might affect the outcome of the suit under the governing law. Id.  Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by

7

showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324.

**Analysis**

   **1.  Service Dogs and Title II of the ADA**

   Taylor relies on a service and support dog, Zeke, to aid with his disabilities. Pursuant to Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  A public entity is defined in the statute as "any State or local government; ... department, agency special purpose district, or other instrumentality of a State...." 42 U.S.C. § 12131(1).  A local police department falls squarely within the statutory definition of "public entity." See Haberle v. Troxell, 885 F.3d 170, 178 (3d Cir. 2018)("Haberle I").

Service dogs are not directly referenced in the ADA statute. In enacting the ADA, however, Congress directed the United States Department of Justice ("DOJ") to promulgate regulations "that implement" the provisions of Title II. 42 U.S.C. § 12134(a). As explained by the Third Circuit, the DOJ issued regulations applicable to service dogs in public accommodations (under Title III) in 1991 and made them applicable to public entities (under Title II) in rules published in 2010. Berardelli v. Allied Servs. Inst. of Rehab. Med., 900 F.3d 104, 119 (3d Cir. 2018). Regulations applicable to both public accommodations and public entities provide that they "shall modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability." 28 C.F.R. § 36.302(c)(1); 28 C.F.R. § 35.136(a). Some exceptions exist for both public accommodations and public entities, such as if the animal is out of control or is not housebroken. 28 C.F.R. § 36.302(c)(1); 28 C.F.R. § 35.136(b). But "if the exceptions are inapplicable, a disabled individual's proposed accommodation of the use of [his] service animal is reasonable under the ADA as a matter of law." Berardelli, 900 F.3d at 119 (citing Johnson v. Gambrinus Co./Spoetzl Brewery, 116 F.3d 1052, 1064 (5th Cir. 1997)).[2]

---

[2] The Third Circuit Court of Appeals previously deferred to these service animal regulations, i.e., the DOJ's interpretation of the ADA, pursuant to Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 844 (1984). See Berardelli, 900 F.3d at 120. Chevron has been overruled. Loper Bright Enterprises v. Raimondo, 603 U.S. 369, 412 (2024). Nonetheless, cases deferring to the ADA service animal regulations are still subject to statutory *stare decisis*. See id. Accordingly, the court relies upon the analysis in Berardelli here.

## 2. Service Dogs and Pennsylvania Law

Unlike the ADA, Pennsylvania's anti-discrimination statutes directly address the use of support animals by individuals with disabilities.  Specifically, the General Assembly has declared that "[t]he opportunity for an individual…to obtain all the accommodations, advantages, facilities and privileges of any public accommodation…without discrimination because of…the use of a…support animal because of…physical handicap of the user" is a civil right, enforceable by the PHRA.  43 PA. STAT. § 953.  Pursuant to the PHRA, it is an "unlawful discriminatory practice":

> (i)    For any person being the owner, lessee, proprietor, manager, superintendent, agent or employe of any public accommodation, resort or amusement to:
>
> (1) Refuse, withhold from, or deny…to any person due to use of a guide or support animal because of…physical handicap of the user or because the user is a handler or trainer of support or guide animals, either directly or indirectly, any of the accommodations, advantages, facilities or privileges of such public accommodation, resort or amusement.

43 PA. STAT. § 955(i)(1).

The term "public accommodation, resort or amusement" is defined broadly by the PHRA using more than 200 words. 43 PA. STAT. § 954(l).  The definition

includes "any accommodation, resort or amusement which is open to, accepts or solicits the patronage of the general public," and specifically references businesses like the one involved in this case such as: 1) businesses where food and beverages are retailed for consumption on the premises; 2) retail stores; 3) amusement and recreation parks; and 4) gymnasiums. Id.

Additionally, and unlike the ADA, "the PHRA provides for individual liability in cases where a person aids [or] abets acts of discrimination." Bernhard v. Brown & Brown of Lehigh Valley, Inc., 720 F. Supp. 2d 694, 705 (E.D. Pa. 2010). Specifically, under the PHRA, it is an "unlawful discriminatory practice" for "any person…to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice…or to attempt, directly or indirectly, to commit any act declared by this section to be an unlawful discriminatory practice." 43 PA. STAT. § 955(e).  For the purposes of the PHRA, the term "person" includes the Commonwealth of Pennsylvania and all political subdivisions. 43 PA. STAT. § 955(a).

Pennsylvania has also made it a summary offense for certain businesses to preclude individuals using service or support animals to assist with their disabilities.  Pursuant to the Pennsylvania Crimes Code, "[a] person is guilty of a summary offense if he, being the proprietor, manager, or employee of a theatre, hotel, restaurant or other place of public accommodation, entertainment or

amusement, refuses, withholds or denies any person, who is using a service, guide or support dog or other aid animal to assist an individual with a disability…the use of or access to any accommodation, advantage, facility or privilege of such theatre, hotel, restaurant or other place of public entertainment or amusement." 18 PA. CONS. STAT. § 7325(a).

### 3. Application to this Dispute

To summarize Taylor's legal theory, he asserts that State College violated Title II of the ADA and the PHRA because Estep, its municipal police officer, did not enforce Title III of the ADA, the PHRA, or 18 PA. CONS. STAT. § 7325 when she responded to the incident involving Taylor and KNB.

### a. Title II ADA Claim

To succeed with his Title II ADA claim against State College, Taylor must demonstrate the following four (4) elements derived from 42 U.S.C. § 12132: (1) he is a qualified individual; (2) with a disability; (3) that was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; and (4) that such exclusion or discrimination occurred by reason of his disability. See Geness v. Admin. Off. of Pennsylvania Cts., 974 F.3d 263, 273 (3d Cir. 2020)(citations omitted)("Geness II").  As for causation, if a person's "disability was a "but for"

cause of the deprivation or harm he suffered, then the fourth element of an ADA claim has been met." Haberle I, 885 F.3d 179 (citations omitted).

State College does not challenge the applicability of 42 U.S.C. § 12132 to Estep's interaction with Taylor.[3]  Moreover, in moving for summary judgment, State College concedes the first three elements of Taylor's case.  State College argues, however, that Taylor cannot present evidence that the municipality was a but-for cause of the plaintiff being denied access to KNB's indoor playground.  In line with the statute, State College also argues that there is no evidence that Estep denied Taylor the benefits of police services, programs, or activities or excluded him from participation in these services.  Per State College, Taylor cannot demonstrate that Estep subjected him to discrimination.

Taylor counters that "the officer did not enforce the provisions of the ADA or the PHRA, despite knowledge that it was illegal to discriminate against a disabled individual like the [p]laintiff." (Doc. 45, Pl. Br. in Opp. at 10).  Taylor's reference to Estep's knowledge triggers another consideration.  Claims for compensatory damages under Title II of the ADA require a showing of intentional

---

[3] "[T]he phrase 'service, program, or activity' under Title II…is 'extremely broad in scope and includes *anything* a public entity does.' " Furgess v. Pennsylvania Dep't of Corr., 933 F.3d 285, 289 (3d Cir. 2019) (quoting Disability Rts. New Jersey, Inc. v. Comm'r, New Jersey Dep't of Hum. Servs., 796 F.3d 293, 301 (3d Cir. 2015))(emphasis added).  Additionally, Section 12132 is framed in the alternative and the final clause, "subjected to discrimination," is a catch-all phrase that prohibits all discrimination by a public entity, *regardless of the context*. Haberle I, 885 F.3d at 180 (citations omitted).

discrimination. See <u>S.H. ex rel. Durrell v. Lower Merion Sch. Dist.</u>, 729 F.3d 248, 261 (3d Cir. 2013).  That involves demonstrating deliberate indifference. <u>Id.</u> at 263.  "[D]eliberate indifference can be satisfied on a showing the official acted or failed to act despite his knowledge of a substantial risk of serious harm." <u>Haberle v. Borough of Nazareth</u>, 936 F.3d 138, 141 (3d Cir. 2019)("<u>Haberle II</u>")(citations and internal quotation marks omitted); <u>see also</u> <u>S.H.</u>, 729 F.3d at 264 ("the deliberate indifference standard requires knowledge").

Taylor contends that Estep should have enforced the ADA against KNB and references her knowledge about that statute.  But Title III of the ADA regarding public accommodations does not contemplate enforcement by municipal police departments.  That job falls upon the impacted individual or the DOJ. <u>See</u> 42 U.S.C. § 12188(a)(1)-(2) (entitling a plaintiff to the procedures and remedies of the Civil Rights Act of 1964, 42 U.S.C. § 2000a-3(a), which itself permits DOJ intervention in such an action); 42 U.S.C. § 12188(b)(directly authorizing the DOJ to investigate ADA violations and commence an action for injunctive relief, monetary damages, and civil penalties).

Taylor also contends that Estep should have enforced the PHRA against KNB.  The text of the PHRA also does not contemplate enforcement by municipal police departments. That job also falls upon the impacted individual or the

Pennsylvania Office of Attorney General with redress before the Pennsylvania Human Relations Commission and through the courts. 43 PA. STAT. §§ 959-960.

State criminal law, however, is clearly within Officer Estep's purview. Taylor thus argues that State College intentionally discriminated against the plaintiff "by refusing to enforce the provisions of the [C]rimes [C]ode" relative to the plaintiff's use of a service dog "and refused to take action to enforce the law in any way." (Doc. 45, Pl. Br. in Opp. at 4). He asserts that "[t]he officer had the provisions of the [C]rimes [C]ode available to her for reference," yet she did not do so. (Id. at 9-10). The record also reflects that Estep did not call a supervisor or speak with a representative of the Centre County District Attorney's office.

The court will approach Taylor's argument about enforcement of the Crimes Code provision a few different ways. It is helpful to start with the nature of the applicable statute. As indicated above, it is a summary offense in Pennsylvania for owners or employees of public accommodations to discriminate against a person with a disability who uses a service or support animal to assist with that disability. See 18 PA. CONS. STAT. § 7325. Summary offenses are punishable by up to ninety (90) days imprisonment and a fine of up to $300.00 when no higher fine is established. 18 PA. CONS. STAT. §§ 1101, 1105. Under Pennsylvania law and its rules of criminal procedure, summary offenses like Section 7325 are enforceable by "law enforcement officers," who institute

15

summary proceedings by citation. [4]   See 18 PA. CONS. STAT. § 106(c); PA. R. CRIM. P. 402.

Thus, per Taylor's arguments, nonenforcement of 18 PA. CONS. STAT. § 7325 would subject Pennsylvania police departments to ADA and PHRA claims each time one of their officers failed to cite an owner or employee of a public accommodation after receiving a report that the business discriminated against an individual relying upon a service or support dog to aid with their disabilities.

Such a broad-brush position ignores the factual nuances of Taylor's own case.  Indeed, even when reviewing Estep's bodycam video and the remainder of the summary judgment record in a light most favorable to Taylor and construing all inferences in his favor, Taylor has not demonstrated that Estep discriminated against him in her response to the incident.

First, Estep testified that she did not know about the above summary offense on the date she interacted with Taylor. (Doc. 44-3, Pl. Ex. 2, A. Estep Dep. 15:4-14).   Estep's testimony is supported by her repeated statements to

---

[4] As a State College police officer, Estep's authority derived from the Pennsylvania Borough Code, 8 PA. CONS. STAT. § 1121(b), which provides that "[a] borough police officer shall have those powers and abilities as are granted to police officers under the laws of this Commonwealth, the rules of the Supreme Court or the ordinances of the borough for which a fine or penalty is imposed unless otherwise excepted in this part."  The Nittany Mall is not in the Borough of State College, but in the municipality of College Township.  The court infers that College Township contracts with the Borough of State College for the provision of police services as authorized by Pennsylvania law. See e.g. 8 PA. CONS. STAT. § 1202(24).

Taylor in the bodycam video that the situation was not a criminal matter. (Doc. 44-4, Pl. Ex. 4, at 7:27-7:35). In her deposition, Estep also admitted that, in retrospect, Section 7325 "was appropriate for what occurred." (Doc. 44-3, Pl. Ex. 2, A. Estep Dep. 21:22–22:7). Estep's testimony is not contradicted by documentary evidence or other testimony.

Setting aside all that evidence favorable to State College that a jury may disbelieve, Estep did not enforce *any* laws in her response to the incident. She did not cite KNB for violating 18 PA. CONS. STAT. § 7325. But she also did not cite Taylor. This consideration is important because Taylor contends that Estep threatened to arrest him for trespassing. That threat, however, cannot even be inferred from the bodycam video.

Rather, the bodycam footage reflects that the officer's reference to trespassing came up based upon Taylor's demand for an explanation why the officer would not compel KNB to allow the plaintiff into their business. In reviewing the bodycam video, the court is mindful of context, understanding Taylor's conditions as he testified and appreciating the circumstances that led to his police encounter. Moreover, the issue is whether Taylor suffered discrimination by State College's police officer. The focus is thus on Estep's conduct, not the plaintiff's conduct.

As reflected in the bodycam video, Estep began to state, "I cannot force them to allow you in. The only thing I can do is document it. Um, you…" (Doc. 44-4, Pl. Ex. 4, at 2:20-2:26).  After Taylor interjected, this exchange followed:

| | |
|---|---|
| <u>Taylor:</u> | So can he physically make me leave? |
| <u>Estep:</u> | Yeah, because if he tells you to leave, then it becomes trespassing, what you have… |
| <u>Taylor:</u> | [interrupting] How can it be trespassing when I'm not doing anything wrong? |
| <u>Estep:</u> | Because when somebody tells you to leave their business, you have to leave their business. |
| <u>Taylor:</u> | [speaking over Estep] For what reason do they have to ask you to leave? |
| <u>Estep:</u> | For whatever reason, they're claiming your dog is not permitted in there. I don't know their policy. I don't know their rule… |
| <u>Taylor:</u> | [interrupting] They have no reason to ask my dog to leave… |
| <u>Estep:</u> | [speaking over Taylor] Can I finish? Can I finish, please? |
| <u>Taylor:</u> | You can finish. |
| <u>Estep:</u> | Okay. So I don't know if it has something to do with the blowups.  I don't know any of that.  They are allowed to ask people to leave their business.  If the person doesn't leave the business, it's considered trespass.  However, that being said, you have every right to file a complaint against them with like, I think it's the ADA, the Better Business Bureau, whoever is applicable. |
| <u>Taylor:</u> | Well, that's like blowing smoke. |

18

(Id. at 2:26-3:17).

Taylor then asked the officer what would happen if the mall owner decided to ask him to leave. (Id. at 3:17-3:33). Estep responded with another reference to trespassing. She also stated: "But then you have every reason to file a civil complaint." (Id. at 3:17-3:34). Taylor continued, referencing his documentary proof of Zeke's service dog status. (Id. at 3:34-3:39). Estep stated again, "and that's why you file a civil complaint against them." (Id. at 3:39-3:41).

At one point in the discussion, Estep stated: "This is not a criminal matter. This is not a police matter." (Id. at 4:45-4:50). Taylor, however, continued:

Taylor: So if I walk in that store and refuse to leave then it's a criminal matter?

Estep: It does. It becomes trespass at that point.

Taylor: But what I don't understand is what did I do to be asked to leave?

Estep: They can – I can go in there and they can tell me to leave because I'm a police officer. It is their business and they can say, "we don't want you here, you need to leave."

Taylor: They, ah, I mean, ah, I don't, I just, I'm not being smart, but I don't…

Estep: No, I -- No, I understand.

Taylor: I just don't buy that at all.

<div style="margin-left: 2em;">

Estep:    I cannot force them to allow you to reenter. I cannot – I have no control over that. Like, it's not a criminal matter.

</div>

(Id. at 4:55-5:27).

In the quarter-hour she interacted with Taylor in the middle of the Nittany Mall, Estep said many things. She did not, however, threaten to charge Taylor with trespassing. Rather, Estep continued to reference trespassing in response to Taylor's various questions about how the officer was interpreting federal and state laws in those moments after the plaintiff already departed KNB's business. (Id. at 7:27-9:06). Taylor even testified that his family members left KNB's business when the plaintiff and Zeke were asked to leave. (Doc. 44-1, Pl. Dep. 30:24–31:5). Estep's references to trespassing are thus in the hypothetical sense.

Estep also received KNB's side of the story. Rebecca Bolling relayed that Taylor threatened them, stating, "[i]f his family wasn't in here, that [KNB] would have a reason to call the police" as KNB hosted a birthday party among the bounce houses. (Id. at 17:06-19:25). But Estep took no action against Taylor. She only documented a "vague threat" in her report. (Doc. 42, Def. Ex. B, Police Report).

Estep thus deferred in those moments to de-escalation techniques and the civil process. Taylor concedes that Officer Estep was trained to understand the provisions of the ADA. (Doc. 44, Pl. Resp. to SOF, ¶ 19). And there is no dispute

that Estep referred Taylor to the ADA multiple times during their interaction.

Estep chose to diffuse the situation at hand between Taylor and KNB to prevent

a larger disturbance at the Nittany Mall.  In that sense, Estep treated all parties

equally.

Neither party has cited a published opinion by the Third Circuit Court of

Appeals regarding the specific issues in this case and the court's research has

not uncovered anything binding on this court.  All cases referenced by the parties

are decisions of the district courts and from other circuits.  The cases relied upon

by plaintiff, however, are not persuasive.

First, Taylor misapprehends Davis v. City of Philadelphia, No. CV 18-0668,

2019 WL 175097 (E.D. Pa. Jan. 11, 2019), a decision regarding a motion to

dismiss filed by the Philadelphia Police Department ("PPD").  In that case, the

plaintiff alleged that she entered a City View Pizza location where she had eaten

several times before with her service dog. Id. at *1.  Two PPD officers, not

restaurant employees, told the plaintiff that "she [could not] have animals in

here." Id. at *2 (quotation marks omitted).  Per the plaintiff in Davis, she advised

the officers that her dog was a service dog, and that federal law precluded the

denial of services from the restaurant because she was accompanied by that

service dog. Id.  Nonetheless, one of the officers told the plaintiff that he had not

heard of that law. Id.  Forced from the restaurant by the officers, the plaintiff filed

suit against the City of Philadelphia. Id.  In the context of those allegations and

the standard applicable for motions to dismiss, the court stated:

> The Defendants do not address Plaintiff's allegation that
> when the Defendant Officers prevented her from accessing
> a place of public accommodation with her ADA compliant
> service dog they subjected her to discrimination by reason
> of her disability....This allegation, in and of itself, is a
> sufficient basis to state a claim under Title II...Plaintiff's
> specific factual allegations that the Defendant Officers
> prevented her from remaining in City View Pizza with her
> service dog state a facially plausible claim.

Id. at *4.

The instant matter features different undisputed facts.  Estep did not force

Taylor to leave KNB's business.  Taylor left at the direction of KNB's owners.

Estep also did not prevent Taylor from accessing KNB's business.  Rather, Estep

encountered Taylor in a common area of the Nittany Mall after Taylor already

departed.  Taylor maintains an expectation in this case that Estep should have

escorted the plaintiff, Zeke, and the plaintiff's family members back into the

business, cited Schulman and Bolling (or told them they were wrong), and then

forced KNB to allow Taylor and Zeke to watch the plaintiff's grandson play in the

bounce houses.  Under the circumstances, the failure of Estep to do any of those

three things does not evidence discrimination by State College's municipal police

officer.  Presumably, Taylor's proposed course of action would have also

required Estep to stay inside the business to ensure that KNB did not further

discriminate against Taylor or that some other disturbance would not arise. Rather than take a heavy-handed approach, Estep referred Taylor to his civil recourse against KNB. Her conduct does not reflect a violation of Title II of the ADA.

The other case cited by Taylor, Albright v. Sheriffs Dep't Rapides Par., No. CIV.A. 12-2117, 2014 WL 4702579 (W.D. La. Sept. 22, 2014) is also not persuasive. In Albright, the plaintiff attempted to bring his service dog to a neighborhood watch meeting at a café where two sheriff's deputies were featured as guest speakers. Id. at * 1. The manager of the café prevented his entry. Id. Two different sheriff's deputies arrived, and one told the plaintiff: "You can't stay here. She has a right to refuse service to anybody, so you have to leave." Id. at *2. The guest speaker deputies, identified as a commander and assistant chief, were standing nearby and essentially shrugged off the plaintiff's requests for assistance. Id. In Albright, the plaintiff previously encountered the commander at the parish courthouse several years earlier after being denied access to the building by a sheriff's deputy. Id. The commander advised the plaintiff, at that time, that the deputies needed ADA training. Id. At the time of the incident at the café, however, the sheriff's office offered no course or trainings to teach deputies about the ADA or state law concerning service animals. Id. at * 3.

Against those facts, the Western District of Louisiana District Court denied summary judgment in favor of the sheriff's office on the plaintiff's Title II ADA claim. The court explained:

> We agree that whether a service dog is permitted in a restaurant is a straight-forward question of law, but disagree that an officer would be liable if he did not convince the restaurant manager to permit plaintiff to enter with his service animal.
>
> The instant case is not one in which a deputy valiantly defended the civil rights of the plaintiff only to be refused by the restaurant manager. Rather, the officer did not educate the restaurant manager about the ADA nor did he inform [the plaintiff] of his civil rights against the restaurant.
>
> We are troubled that Defendants may have intentionally discriminated against [the plaintiff] and been deliberately indifferent to his civil rights. This case is also distinguishable because [the plaintiff] had a previous experience in which he was refused entry into a courthouse with his service animal and personally notified [the commander], a Defendant in this matter.

Id. at *6 (formatting modified).

In this case, Estep advised Taylor of his ADA rights against KNB for discriminating against the plaintiff due to his service dog. Taylor has not demonstrated that the local authorities had previously impeded his access into a public building or another place of public accommodation. There are no previous incidents weighing on the summary judgment record. Thus, Albright is unpersuasive.

24

Rather, the court finds a case cited by State College to be the most persuasive. In <u>Gipson v. Popeye's Chicken & Biscuits</u>, 942 F. Supp. 2d 1303 (N.D. Ga. 2013), a Cobb County, Georgia police officer responded to a restaurant after its manager demanded that the plaintiff leave due to the presence of his service dog. <u>Id.</u> at 1304–05. The manager called the police to remove the plaintiff and the plaintiff called the police so they would explain his rights to the manager. <u>Id.</u> The police officer ultimately told the plaintiff that the restaurant was private property and that the plaintiff and his service dog would have to leave. <u>Id.</u> at 1305.

Like the case at bar, the <u>Gipson</u> plaintiff asserted that the police officer "condoned" discrimination by Popeye's and thus the municipality was itself liable under Title II of the ADA. The Northern District of Georgia District Court did not find evidence of discrimination under the facts alleged and granted a motion to dismiss. Without a full factual record, as is the case here, the <u>Gipson</u> court determined that the plaintiff had not alleged that the exclusion, denial of benefit, or discrimination was by reason of his disability. The court noted that, as alleged, the officer, "responded to the scene and listened to the position of both sides[,]" and "determined that the restaurant was private property and the restaurant manager could ask [p]laintiff and his service dog to leave." <u>Id.</u> at 1307–08. The

Gipson court thus determined that the police provided equal services to both the

plaintiff and the restaurant manager. The court also stated:

> If the court were to determine that [p]laintiff was denied
> services based on his disability because [the officer] did not
> convince the restaurant manager that [p]laintiff and his
> service dog could remain in the restaurant, the police
> would become responsible for sorting out civil liabilities.
>
> While one might argue that whether a service dog is
> permitted in a restaurant is a fairly straight-forward
> question (and one that the court will need to address with
> respect to Popeye's liability in this civil action), another
> patron might challenge the degree of slope of a
> handicapped ramp into the restaurant, a much more
> difficult question to resolve on the scene.
>
> There can be no expectation that police officers are
> equipped to address that type of situation when responding
> to a disturbance call. County police officers are not civil
> lawyers.

Id. at 1308.

In granting summary judgment here, the undersigned need not rely upon

any broader policy considerations. While Estep did not cite KNB's owners for a

violation of 18 PA. CONS. STAT. § 7325, she advised the plaintiff about his ADA

rights and civil remedies. (Doc. 44-4, Pl. Ex. 4 at 9:21-9:39). She concurred with

Taylor when he asserted that he would go to the media. (Id. at 4:15-4:30, 6:25-

6:40). Estep even advised Taylor: "not just the media, like social media is a good

way to handle it too." (Id. at 6:40-6:46). She also informed Taylor that she would

document the incident and that he could subpoena the police report for the civil

action he stated he would bring against KNB.  (Id. at 10:28-10:43).  Under these circumstances, Taylor cannot demonstrate public services discrimination by Estep in her response to the incident at KNB's premises.  Summary judgment will thus be granted in favor of State College on the plaintiff's Title II ADA claim.

### b. PHRA Aiding and Abetting Claim

As indicated above, Taylor maintains a separate PHRA claim against State College based on assertions that Estep aided and abetted discrimination by KNB.  Generally, PHRA disability discrimination claims are interpreted coextensively with ADA claims.  See Morgan v. Allison Crane & Rigging LLC, 114 F.4th 214, 220, n. 21 (3d Cir. 2024)("federal courts should continue to interpret the PHRA in harmony with the ADA.").  The court, however, must be cautious as not to summarily address the PHRA claim in this context. See Berardelli, 900 F.3d at 126 (discussing distinctions in the PHRA as to damages). For example, Taylor's aiding and abetting discrimination claim is premised upon 43 PA. STAT. § 955(e), which contemplates liability that extends beyond federal anti-discrimination statutes. See Dici v. Commw. of Pa., 91 F.3d 542, 552 (3d Cir. 1996).

Taylor's aiding and abetting theory of liability, however, relies upon a lone allegation that State College "also aided and abetted KNB Inflatables in its discrimination and directly and indirectly discriminat[ed] against Plaintiff by

threatening Plaintiff with arrest if he attempted to enter KNB Inflatables' public accommodation with his support animal." (Doc. 30, Am. Compl. ¶ 37). Otherwise, Taylor has not clarified his PHRA aiding and abetting discrimination claim as separate and apart from his Title II ADA claim.

As indicated above, Estep did not threaten Taylor with arrest. Rather, she referenced trespassing in response to Taylor's various inquiries. And this discussion about trespassing occurred in response to hypotheticals posed by Taylor as he questioned the officer about why she would not force KNB to allow him in. Rather than threaten arrest, Estep discussed with Taylor his various routes to seek recourse against KNB, both through a court of law and through the court of public opinion. Accordingly, summary judgment will also be granted in favor of State College on the PHRA claims.

**Conclusion**

For the reasons set forth above, Defendant State College's motion for summary judgment (Doc. 41) will be granted. Based on the previous ruling dismissing Taylor's motion for default judgment against KNB without prejudice, the plaintiff will be directed to refile that motion within seven (7) days. An appropriate order follows.

Date: 2/25/25

JUDGE JULIA K. MUNLEY
United States District Court